[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 20, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-12720

_____

D. C. Docket No. 04-00131-CV-FTM-29-SPC

ROSE MARIE REYES,

Plaintiff-Appellant,

versus

MICHAEL MASCHMEIER,
Sgt., individually,
MIKE SCOTT, in his official capacity as Lee County
Sheriff, a political subdivision or county office,

Defendants-Appellees,

RODNEY SHOAP, in his official capacity as Lee
County Sheriff, a political subdivision or county office,

Defendant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(April 20, 2006)**

Before BIRCH and MARCUS, Circuit Judges, and MILLS*, District Judge.

BIRCH, Circuit Judge:

In this case, we review a nuanced application of the Fourth Amendment in the public employment realm. Rose Marie Reyes brought a claim under 42 U.S.C. § 1983 alleging that she was unconstitutionally seized when she was struck by Michael Maschmeier, her supervisor and a sergeant in the county sheriff's office, and subsequently berated in an open door meeting. The district court denied the claim, reasoning that the force used was not unreasonable, but we, however, conclude that there was never a seizure within the constitutional meaning of that word and AFFIRM on that ground.

## I. BACKGROUND

On 12 September 2003, Maschmeier, the newly selected head of the DARE program[1] for Lee County and Reyes's new supervisor in the sheriff's department, had been talking to his captain about the deficiencies in the county DARE program. The captain asked for the DARE file, which Maschmeier had to retrieve

---

* Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

[1] Drug Abuse Resistance Education. This is a program designed to teach elementary school children about the dangers of drugs.

from his office.

Returning from his office, Maschmeier saw Reyes waiting for him. Maschmeier approached Reyes from behind and, without warning, suddenly struck her in the back of the head with a three-ring binder containing the DARE program materials. Maschmeier completed his meeting with the captain, walked back past Reyes, and indicated that he was ready to meet with her about the DARE program. Maschmeier gestured for Reyes to come into his office where he berated her so badly that this then thirteen-year veteran of the Lee County Sheriff's office fled the office in tears.

For purposes of our inquiry, we assume that Maschmeier struck Reyes in the neck without warning or purpose. This contact aggravated Reyes's previous two neck injuries.[2] For his part, Maschmeier maintains that Reyes exaggerates the severity of both the "tap" that signaled his knowledge that she was there to meet with him and the invective used in the meeting.

As the newly assigned officer in charge of the DARE antidrug program, Maschmeier had learned that Reyes and other subordinates were going home instead of returning to the sheriff's office when their responsibilities at the school were over. Reyes had requested this meeting with Maschmeier because she had

_____

[2] The injury was, however, covered by workers' compensation.

3

learned that he had spoken to the administration at her school about her performance there. Maschmeier believed that Reyes was working for only a few hours per week and was spending the rest of the time at home. Maschmeier confronted Reyes with these details at the meeting. Reyes acknowledged that the meeting in the office ended when she got upset:

> Q: Did you feel as though Sergeant Maschmeier was in some manner on the day of the incident holding you in his office against your will?
> [Reyes] A: I did feel, because he was my supervisor.
> . . . .
> Q: And you ultimately got upset and left his office, right?
> A: Yes.
> Q: He wasn't able to stop you from leaving his office, was he?
> A: No, sir.
> Q: Did he ever say to you, Stop, you can't leave?
> A: No, sir.
> Q: Did he try to grab you and keep you from leaving the office?
> A: No, sir.

R2-49, Plaintiff's Deposition at 59–60.

Reyes filed suit against Maschmeier, in his individual capacity, and the Sheriff of Lee County, in his official capacity, who at various times was either Mike Scott or Rodney Shoap. Regarding the claim against Maschmeier, the district court granted summary judgment on alternative grounds. First, it held that there was no excessive force violation of the Fourth Amendment. Second, it held that Maschmeier was protected by qualified immunity because it was not clearly

4

established that these actions would constitute a constitutional violation such that Maschmeier was on notice of his personal liability. As to the sheriff, the court stated again that there was no constitutional violation but held in the alternative that, even if Maschmeier violated Reyes's Fourth Amendment rights, there was no evidence that the sheriff was responsible for that violation.

On appeal, the parties argue about how force must be used to make a seizure unreasonable under the Fourth Amendment. These arguments skip an important step in Fourth Amendment analysis. In the subsequent section, we do not reach the question of whether Maschmeier's actions were unreasonable because there was no Fourth Amendment seizure. For this reason, we do not address the district court's conclusions that there was no excessive force, that Maschmeier was entitled to qualified immunity, and that the sheriff was not responsible for Reyes's injury.

## II. DISCUSSION

We review a district court's decision regarding summary judgment on a § 1983 claim de novo. Harris v. Coweta County, 433 F.3d 807, 811 (11th Cir. 2005). We use the same legal standards as the district court and draw evidentiary inferences in favor of the nonmoving party. Id.

In relevant part, The Civil Rights Act of 1871 states:

> Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. Maschmeier, when performing his duties as a sergeant in the Lee County Sheriff's office, is a state actor for purposes of § 1983. Therefore, when he acts under the color of state law, Maschmeier may not deprive Reyes of any rights secured by the Constitution, including the Fourth Amendment. Reyes alleges that Maschmeier violated her Fourth Amendment rights.

The application of the Fourth Amendment in unique settings, such as the employment setting we consider today, presents difficult issues. On the one hand, public servants "are not relegated to a watered-down version of constitutional rights." Garrity v. New Jersey, 385 U.S. 493, 500, 87 S. Ct. 616, 620 (1967). On the other hand, "nothing in the Fourth Amendment endows public employees with greater workplace rights than those enjoyed by their counterparts in the private sector." Driebel v. City of Milwaukee, 298 F.3d 622, 637 (7th Cir. 2002). These cases bookend the contours of the Fourth Amendment inquiry posed by this case.

From the outset, we are reminded of the concerns regarding the First

6

Amendment in the government workplace. In that context, the Supreme Court observed that there is a "common-sense realization that government offices could not function if every employment decision became a constitutional matter." Connick v. Myers, 461 U.S. 138, 143, 103 S. Ct. 1684, 1688 (1983). Thus, it may be that meetings in government offices are simply not constitutional matters, which would make it unnecessary to discuss whether they are "reasonable workplace seizures." However, the Supreme Court has cautioned us against Fourth Amendment proclamations that are divorced from their contexts. See, e.g., Michigan v. Chesternut, 486 U.S. 567, 572, 108 S. Ct. 1975, 1979 (1988). Therefore, we continue with the Fourth Amendment analysis despite our intuition, informed by common sense, that not every meeting is a constitutional matter.

In relevant part, the Fourth Amendment states, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The Fourth Amendment broadly declares a right of the people to be free from certain types of intrusion, which right courts construe as a limit on government action. For there to be liability in this case, then, there must be a government seizure and that seizure must be unreasonable. Evans v. Hightower, 117 F.3d 1318, 1320 (11th Cir. 1997).

Because claims brought under the Fourth Amendment are context specific, a

7

review of prior decisions is helpful in discerning how the Fourth Amendment applies in the public employment context. We begin with the Supreme Court's treatment of workplace searches. The Supreme Court has applied the Fourth Amendment in the private employment setting, holding that citizens have privacy interests in their work spaces, and, therefore, employees have a protectable, reasonable expectation of privacy against workplace searches. See Mancusi v. DeForte, 392 U.S. 364, 367, 88 S. Ct. 2120, 2123 (1968).

When the intrusion was by a government employee's supervisor, that is, not by the police, the Court concluded in fragmented plurality opinions that when there was a reasonable expectation of privacy, the Fourth Amendment still applied. See O'Connor v. Ortega, 480 U.S. 709, 718, 107 S. Ct. 1492, 1498 (1987). In O'Connor, an employee of a public hospital was investigated as part of an internal inquiry by the hospital administration. Id. The Court was concerned with

> "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." In the case of searches conducted by a public employer, we must balance the invasion of the employees' legitimate expectations of privacy against the government's need for supervision, control, and the efficient operation of the workplace.

Id. at 719–20, 107 S. Ct. at 1498–99 (alteration in original and citations omitted).

8

Thus, we conclude that the Fourth Amendment regulates supervisor conduct in the government workplace, even if the extent and manner of that regulation is unclear under the Supreme Court's cases.

Having established that the Fourth Amendment governs workplace searches by government supervisors, we turn to the question of seizures by government supervisors. We cannot find express resolution in either our own or Supreme Court decisions regarding supervisors seizing public employees at work.[3] We do, however, find guidance regarding seizures in workplaces. "[W]hen people are at work their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials, but by the workers' voluntary obligations to their employers." INS v. Delgado, 466 U.S. 210, 218, 104 S. Ct. 1758, 1763 (1984).[4] Thus, the Supreme Court implicitly recognizes that voluntary workplace obligations may permissibly be contrasted with the kind of limits on movement

---

[3] Seizures of public employees, in circumstances dissimilar to those of this case, have been reviewed elsewhere. See, e.g., Driebel, 298 F.3d at 627; Aguilera v. Baca, 394 F. Supp. 2d 1203, 1214 (C.D. Cal. 2005) (holding that sheriff's deputies were not seized for Fourth Amendment purposes when ordered to remain at work to be questioned in connection with an internal investigation); United States v. Fagan, 28 M.J. 64, 69 (C.M.A. 1989) (observing that a marine instructed by his chain of command to remain at a facility for fingerprinting was not seized for purposes of the Fourth Amendment).

[4] In Delgado, the Court concluded that workers in two factories were not seized for Fourth Amendment purposes when the INS placed agents near the exits of the factories. 466 U.S. at 218, 104 S. Ct. at 1763.

9

that result from law enforcement action.[5]  We conclude, therefore, that, as an initial matter, a claim that a government supervisor has seized a public employee in violation of the Fourth Amendment must allege circumstances that implicate more than the obligations that arise from the employment relationship.  This affirms our conclusion that meetings attended by government employees are not seizures for purposes of the Fourth Amendment.

However, workplace interactions can become seizures.  Cf. Delgado, 466 U.S. at 215, 104 S. Ct. at 1762 (observing that a consensual encounter with the police becomes a seizure regulated by the Fourth Amendment when the interlocutor is arrested).  Such a seizure would be "a governmental termination of freedom of movement," Brower v. County of Inyo, 489 U.S. 593, 597, 109 S. Ct. 1378, 1381 (1989), in circumstances when "a reasonable person would have believed that he was not free to leave," Chesternut, 486 U.S. at 573, 108 S. Ct. at 1979 (quotations omitted).  The clearest example of this type of transformation is from a citizen's consensual conversation with law enforcement personnel to an arrest of that citizen.  See Delgado, 466 U.S. at 215, 104 S. Ct. at 1762.

---

[5] At this point, we distinguish between the government as law enforcer and government as employer.  See Driebel, 298 F.3d at 637 ("[I]n cases involving the constitutional rights of police officers, courts must distinguish between a police department's actions in its capacity as an employer and its actions as the law enforcement arm of the state.").

As to the matter before us, Reyes's allegation fails to state a claim under the Fourth Amendment. She asked to meet with Maschmeier in the context of his position as her supervisor. In the resulting meeting, Maschmeier discussed the amount of time Reyes spent conducting the duties of her office and counseled her that, under the circumstances, going home instead of returning to the office was unacceptable. Such meetings are the daily business of the public servant, and, although we find that Reyes's allegations of Maschmeier's conduct, if true, are disturbing as a professional matter, her allegations do not remove the case from the employment setting. That is, Reyes's allegations do not change the fundamental dynamic between her and Maschmeier from an employment relationship into a situation where Maschmeier is acting as a law enforcer.[6]

Furthermore, the meeting between Reyes and Maschmeier was not transformed into a Fourth Amendment seizure by Maschmeier's conduct. Reyes provides no evidence that indicates a restraint on her ability to move. Although

---

[6] Although we resolve the case by adapting the traditional Fourth Amendment analysis to the workplace, we leave for another day—principally because the argument was neither presented nor briefed to us—the question of whether there must be governmental authority to seize before there can be an unlawful government seizure. With this caveat, we do not mean to disturb any statutory inquiry regarding the scope of employment or color of state law analysis. However, insofar as the Fourth Amendment is a limitation on *government* power, it seems reasonable to inquire into the authority for the contested exercise of coercive governmental power prior to pursuing a formulaic analysis of whether the actions of state employees appear improper. Such a distinction focuses claims of constitutional violation on actions properly attributable to the government, leaving other claims to state tort law.

Reyes claims that she felt like she was not able to leave the meeting, those claims are based in the supervisor-employee relationship and are therefore not indicators that something more had transformed the meeting into a Fourth Amendment seizure. However, most tellingly, Reyes left the meeting at the moment of her choosing. We conclude that the interaction between Maschmeier and Reyes does not present the exercise of governmental authority akin to an arrest.

Nor is our analysis changed by the cases that support the proposition that contact can functionally seize a person. See Harris v. Coweta County, 433 F.3d 807, 816 (11th Cir. 2005) ("[R]amming [a] vehicle under the facts alleged here, if believed by a jury, would violate [the victim's] constitutional right to be free from excessive force during a seizure."); Pruitt v. City of Montgomery, 771 F.2d 1475, 1478 (11th Cir. 1985) ("[T]he shooting itself was a 'seizure' within the meaning of the Fourth Amendment."). Under a liberal reading of those cases, the contact at issue in this case fails to approach the established threshold, which left the victim in each case unable to move. Thus, even adding the gratuitous contact at issue in this case to the subsequent job-related meeting fails to transform the actions in question into a constitutional seizure.

For these reasons, we conclude that Reyes was not seized for purposes of the Fourth Amendment. Because there was no Fourth Amendment seizure, there

12

was no Fourth Amendment violation and there is no liability under 42 U.S.C. § 1983 for either Maschmeier, individually, or Sheriff Scott, in his official capacity. We do not reach the other grounds discussed by the district court in the disposition of this case.[7]

## III. CONCLUSION

We have reviewed Reyes's claim that her supervisor's conduct violated her rights under the Fourth Amendment, which forbids unreasonable searches and seizures. We do not consider whether Maschmeier's conduct was unreasonable, because there was no seizure in this case. **AFFIRMED**.

---

[7] Rowe v. Schreiber, 139 F.3d 1381, 1382 n.2 (11th Cir. 1998) ("We may affirm a decision on any adequate grounds, including grounds other than the grounds upon which the district court actually relied.").